or Belloisi? Belloisi. All right. Give folks a minute to recruit. Thank you so much. Good morning, Your Honors. May it please the Court, I'm Lucas Anderson here for Paul Belloisi. And I would like to begin with our first point relating to Belloisi's awareness of the object of a conspiracy. The various arguments that have been presented so far. That's very similar to our argument. Our argument is that my client went into the avionics compartment of an airplane in order to get something that had been smuggled within there. That the evidence was sufficient to show that. However, there is not sufficient evidence to show that he knew what was going to, what it was that he was going to be taking out of there. And all the arguments that have been presented to refute that have failed to grapple with this one serious problem with this record here. Where the only evidence that anybody in the world was knowingly involved in a controlled substance is the fact that cocaine was found in this avionics compartment. That is certainly sufficient evidence to say that there was such a conspiracy and that somewhere in the world there were knowing participants. But on this record, we could not convict anybody, any identifiable person at least, because of the knowing element. If the record of this case were exactly the same as it is now, but with one difference, and that's what is found in the avionics compartment three and a half hours before my client goes to it. Maybe if inside of these packages, and there's a good photograph of these packages at page 843 of the appendix. Maybe if inside of these packages, these CDP officers had found bundled wraps of foreign currency. Or if they found something more serious, such as explosives. If that's the only change to the record. Yes, Your Honor? I'm sorry. As I've been reading these papers, I was wondering, simple factual question. The avionics compartment, is that accessible both from inside and outside the plane? I believe there is a way for somebody in the cockpit to get down to it. I'm guessing now that it depends on the model of the airplane. But in this way, it was only accessible, it was only accessed from the underside of the plane. Well, it's a little odd since he's saying that what he was doing was looking for food, and I'm not sure he would find food in the underside of the airplane. We have completely abandoned that argument. Our argument has nothing to do with trial counsel's theory to the jury that he had gone into the plane itself in order to find food. Okay, so what we're trying to do is figure out whether or not a jury conclusion that he knew what the object was. And so you, I think, just said that the only proof of that was an after-the-fact identification that it was, in fact, cocaine. What about the fact that the drugs weren't concealed? The interactions with Lester, the exculpatory statements, the preparations that were made specifically with, like, the holes in the jacket that he knew about the size and the shape? None of those, you think, would support a jury conclusion? I would say that the drugs are concealed, and if we look at the photograph of them at page 843, even if he had ever seen those, and he was never in the same room as those packages until they were introduced at trial, they were removed from the airplane long before he got there. But even if he had, even if we took away that great fact for us and said that he got in the airplane and he saw those packages, they are equally consistent with many, many different offenses. Okay, but what about the holes in the jacket? Yes, he was going into that airplane, we concede, in order to get something out. But he wasn't going to put finches, right, in the jacket or gold bars, right? That wouldn't have fit. There are possibilities that we can exclude things that, it has to be something that fits in the airplane compartment, and it has to be something that would fit in the lining of his jacket. That's the universe in which we can narrow these things down to. Okay, but before you said it was just the drugs. So we at least have the jacket, something that won't die in the belly of a plane. What about the interactions with Lester? The interactions with Lester, I invite the courts to look through the government's supplemental appendix to the contents of those conversations. They say nothing about whether my client or Lester knew anything about the specific object of the conspiracy. And I am still saying that the only indication that my client knew that these were controlled substances is the fact that controlled substances were discovered to be what was inside those packages. All this other evidence you cite is evidence of the thing that we have conceded, the preliminary issue, as to whether he was knowingly involved in some sort of offense that he knew had to involve smuggling. If he had thought that it was large pieces of art, he wouldn't have cut the jacket like that. No. If it was bottles of currency, if it was explosives, if it was ammunition, if it was stolen documents, if it was anything that was forged, if it was anything that somebody just wanted to smuggle because they wanted to evade tariffs. You're saying that the size of the jackets, the shape of the materials of the drugs that were concealed, the statements with Lester, and that as a matter of law, that's not enough for a jury? On this record, the shape of the packages has nothing to do with it because, again, he never saw those. I just want to finish this one statement. I'm sorry. Because I understand that Judge Perez is an important point for you. If he had gone into that plane and if the law enforcement officials hadn't taken those drugs out, then we would know what it was that he would do when he saw them. We'd have no idea what he would have done. We don't know what he was told he was going to find. We don't know if he cared about what he was going to find. All we do know is that what he was supposed to find, according to the people who set this conspiracy up, simply did not happen because these CBP officials made that impossible for them to find out. I'm sorry. Judge Robinson. So as I think you recognize in some of the 28J stuff that's happened, one of the cases that certainly is in our box of cases here is Anderson. And as I read Anderson, Anderson endorses the concept that there are times in which you can infer from the role that somebody has in a conspiracy that they know the object of the conspiracy simply because of the role they're playing. Right? Not quite. Okay. Tell me what? There are cases where people have made the argument that because somebody had an essential role, they're like an airport worker or they only have access to certain areas, that's why they're hired. And that means that there's no reason for them to have necessarily known. But then there are other people, like the driver in Anderson. That's the whole universe of anybody who has a car and who can drive ecstasy from the Canadian border to New York City. That person in Anderson, there was an abundance of evidence that the leaders of that conspiracy had been in communication with that person, and there was testimony in that case that the leaders of the conspiracy would not have trusted that individual person with this almost million-dollar shipment all the way from the Canadian border to New York City unless they trusted him. But I read our discussion in Anderson as viewing that testimony as icing on the cake and as the underlying inference that drug dealers would be very unlikely to confide hundreds of thousands of dollars' worth of drugs to the sole control of a person who is not a trusted member is a permissible inference in some category of cases where there's a reasonableness limitation. And I understand there's— Highly fact-dependent. Huh? Highly fact-dependent. This Court did not hold in Anderson that it's essentially a strict liability crime if the drugs are worth a lot of money. Over and over again, this Court in Anderson used italic emphasis to say that a common-sense inference was appropriate, quote, in this case, to this conspiracy. Okay, what— To this conspiracy. This question of the $250,000 of cocaine, why is that a different enough fact pattern from Anderson for us— for it to have been inappropriate for Anderson to have been— for this to have been one of the inferences the jury was able to conclude? It was certainly different enough in the Lorenzo case where it was a quarter of a million dollars of cocaine in that case. And in that case, the defendant, Julio Lorenzo, actually took possession of this suitcase. This courier had come to New York from the Dominican Republic, and the courier, who was the defendant's nephew, said, this case contains drug. The defendant, Julio Lorenzo, took that suitcase, then took the courier to a hotel room, went to her hotel room the next day, gave her $14,000 in cash, took her to the airport and made sure that she got on the plane or that she checked the bags. I thought she took the suitcase after—I thought she was picked up by someone else and driven to Pennsylvania and then came back with the suitcase. Am I misremembering the facts of the case? Yes. The drugs had made a roundabout trip to him. But he took that, and then the next day gave her— We don't know whether the drugs—we don't have any reason to think the drugs were still in the suitcase by the time he came back, and the uncle handled it. No. What we do know is that this defendant, who was essential to the completions conspiracy, this nephew or nephew-in-law of the leader of the conspiracy, was handing cash, taking couriers back to the airport and escorting them. But there is no evidence that he saw what was inside the case. Just like in Samaria, this person who has packages taken to his car doesn't see what's inside them. You're doing a thoughtful job of distinguishing every case other than the one you were asked to distinguish. So come back to Anderson. I would love to. Because I think the notion in all of those cases there are—he's the uncle, he's helping out his niece. There's all sorts of reasons why you could easily infer something other than him being a trusted member of the conspiracy who would know. In Anderson, it really was the fact that this is a bunch of really valuable stuff, and he is free to do what he wants. It's contrasted with Torres, where there's two guys over his shoulder the whole time. Right? Why isn't this more like Anderson than Torres? Well, there's two points I want to make first. The government has not presented this Anderson argument. It is an argument that just came up the first time, so it's not presented. And, in fact, they've declined to present it. But it's distinguishable because the defendant there would have had, they know, sole access to this bag of almost a million dollars of ecstasy all the way from the Canadian border to New York City. What do we know here about how long Bill Luisi would have had access to these packages alone? At least while he was in the belly of the plane, right? At least while he was in the belly of the plane, yes. So isn't that enough of a sole control of a lot of valuable goods to put it in Anderson land? No, I believe that is a highly distinguishing fact. As far as we know, as soon as Bill Luisi got into either the terminal or outside the airport, he would have had to give those packages either to this Lester person or to whoever else. We have no idea. It may be that they then wanted him to drive it. Well, no, I mean, I can appreciate that. But that's not the standard we have to do is whether or not it was permissible for the jury to infer it, right? Not could they have inferred something else, right? Your burden is to show that it was impermissible for the jury to presume that because he had sole control and it was a lot of money that he knew exactly what it was. And so why is that wrong? Especially when you add things to it like he knew what kind of holes to put in his jacket. He had been having conversations with Lester. There's a lot to unpack there. But I will say, again, he did not ever get anywhere close to these drugs. The defendant in Anderson was in this conspiracy participant's car, sitting in the front seat while this bag of drugs was at his feet. This defendant in Anderson had been in communication with the leaders of the conspiracy. There was a cooperator in that case who testified about the leaders of the conspiracy. I think it was 41 times he had been in contact with them before this offense. We have no idea. And there's no basis to reasonably infer as to whether Beloisi ever talked to anybody who did know this specific object of this offense, as opposed to the defendant in Anderson who was communicating with the leaders of the conspiracy themselves. And they were, they knew in that case, giving him sole access to these drugs, all the way from the Canadian border to New York City. Here, if it's equally possible, if there's evidence that gives us an equal basis to infer that Beloisi would have had to surrender, you know, his jacket or his tool bag as soon as he was in the terminal, an equal basis to infer that, or to infer that he would have had sole possession of it for a long time. It's simply, and it also contradicts this alternative argument, the one that the government has consistently presented, that actually the reason he was recruited was because of his job. And so it would be quite a coincidence if Beloisi was recruited because he had this job, he was one of very few people who worked at the airport, and also because he was central to this conspiracy. He was one of the organizers who just, you can just assume, without any evidence, that he knew about all these things related to conspiracy. Well, this Court did in Hueso. This Court in Hueso, in the Hueso case, I think it was Judge Walker's opinion, described the Samaria case with that livery driver and said, you know, if the importance of a defendant's regular employment, you know, in that case it was a livery driver, if the defendant's regular employment is important to them being able to carry out this conspiracy, that quote supports an inference that he became involved in this conspiracy by happenstance and not by design. That is a quote that's reproduced from Hueso in the government's response brief. If there are no further questions, I would like to quickly address our second argument on appeal because I see that my time has passed. Thank you. The government's brief and the district court's ruling on the Rule 29 motion each make clear, I think, that there is nothing in this record to show that Beloisi, in fact, knew that this airplane had arrived from Jamaica earlier that day and that the controlled substances in there were therefore imported. The mere fact that he had ample opportunity to learn, that's speculation because there's no evidence that he, number one, cared to learn, had any interest in learning where this plane had come from three and a half hours before, and second, that he then did take, in fact, take advantage of those opportunities. No further questions? I thank the Court. Thank you. Tony Palmer. Good morning. I think it's still morning. May it please the Court. I'm Robert Pollack. I represent the United States on this appeal. I also represented the United States in the district court below. The evidence introduced at trial. Your adversary seems in his reply brief to think that you're the one who should have been indicted rather than the defendant. And I'm therefore glad to hear specifically from you as to your take on this case. I'm not sure I understand. I took the same tone, perhaps, that Your Honor is remarking from my adversary's reply brief. I didn't exactly understand the full nature of the accusation, except perhaps that I had in some way mischaracterized, at least in one place, the argument. So I want to be very careful that I get the – that I characterize the argument correctly here. I think the only dispute – I mean, there's no dispute that the evidence was sufficient to show that there was a conspiracy to import and possess and distribute cocaine, that there – that it was an insider conspiracy at JFK, and, in fact, that the defendant was the inside man. He was the person at JFK who was prepared to – Wait a minute. We don't know – I mean, you know, this was one of – it was striking to me how quickly the agents here acted, which left us with very little actual evidence rather than inferences, right? So we don't know whether there was somebody else who was in on the conspiracy who was waiting on the tarmac 20 yards away to take possession of the contents, and wouldn't that be a very different case if it was? So I have an unfortunately complicated answer to that. When I say that we know that there was an insider conspiracy, I just mean somebody put the cocaine into the airplane in Jamaica, knowing and expecting that there was someone at JFK with access to the tarmac to take it out. Whether there was somebody else on the tarmac – in fact, the evidence – the evidence at trial supported, and the government argued to the jury, that that person on the tarmac was, in fact, the defendant. It is not correct what defense counsel said just now or a few minutes ago, that he only showed up two and a half hours later. There was evidence in the record that he surveilled the airplane from – basically from the time of its arrival and throughout the day. I understand defendant to be conceding that there's sufficient evidence that his client was involved in smuggling something, right? Right. And the issue is whether or not there's sufficient evidence to infer, non-speculatively, that he knew the something was cocaine. And so this isn't a case where we've got communications intercepted that tell us something about what the something was. And I'm trying to figure out – we've got this Torres case where we said, yeah, the guy was there to pick up the – in that case, I guess it was furniture – shelving or cabinetry that had controlled substances in them. And we said, yeah, he clearly was up to no good, but did he know that the no good was controlled substances? And we said, no, there's not enough evidence, just because he's the one who was picking it up. Why is this different? So this is different for the reasons that Your Honor stated a few minutes ago in reference to the Anderson case. I don't think the Anderson case is actually necessary to reach this conclusion. I think it's clear enough in the other cases that are in the briefs, but Anderson states it very squarely, that we can infer the knowledge of the particular defendant from all of the circumstances of the conspiracy, from the nature of the conspiracy itself, and also from the nature of the defendant's particular role in the conspiracy. And here there was a ton of evidence of that, both from the sort of actus reus of what he actually did in the avionics compartment that day, also from his surveillance throughout the day, and also the stuff with Lester. But what's the basis for inferring again? You're telling us all the reasons why we can infer he was involved in a smuggling conspiracy. Right. What's the basis for inferring that he knew that the thing he was smuggling was cocaine? Right? There's nothing in those facts that distinguishes smuggling currency, smuggling Cuban cigars, something else from smuggling controlled substances. So what gets us to controlled substances? Right. So the key fact here that gets us to controlled substances is that notwithstanding defense counsel's characterization, the bricks of cocaine were hidden but undisguised. They were behind an insulation blanket, which is to say they were hidden from an innocent mechanic who might be in the avionics compartment for a good reason, but the person who knew to go get them knew to peel back that insulation blanket, as the defendant did, and then these were just bricks of drugs totally undisguised. If all that is true and he reaches in, how does he know they're bricks of drugs? So that was the two points that defense counsel made that I want to specifically address. One is that he emphasized a couple of times that he never actually saw them because they were taken out before then, and the second was I think that based on the photograph and the record, he's positing that it's not obvious that they're drugs. I think both of those are wrong. First of all, the fact that he didn't actually see them is only because, of course, the government or CBP officers got to it first, but the nature of his role in the conspiracy necessarily entailed his expectation and the expectation of other conspirators that he would see them. Someone put them into the avionics compartment. They didn't hide them in a box. Tell me why drugs. Tell me why drugs. He would see them. No question about that. Why do we know that he would see them and they were drugs? There may be a very good answer to it. So the answer is that that's a quintessential jury question. The jury saw not just the photograph that defense counsel points out, which I posit is actually obviously bricks of narcotics, but the jury also saw the actual drugs. I mean, they heard the sounds of the drugs pounding on the table and they smelled them in the courtroom when the agent took them out of the evidence box. The jury is entitled to look at the actual drugs in the actual packaging and the photograph taken on the day and to say, as I argued to the jury, any reasonable person who sees this would know this is narcotics. And what about the holes in the jacket? The holes in the jacket, again, I think I say in one of the briefs that if you show up at a baseball game with a glove, it's fair to infer you're expecting to catch a ball. He showed up with a cutout on the inside lining of his jacket. The jury saw the jacket. They could inspect the jacket. These weren't accidental holes in the seams. These were cuts in the front of the jacket making impromptu pockets. I'm thinking of the tens of thousands of kids who go with a glove to catch a ball and never get one but go ahead. That's right, yeah. And there is agents who testify that this is a common practice of smugglers to have these cutouts in a jacket. He also had an empty tool bag in what they call the tug, the sort of small vehicle at the airport. Well, right, but anything could fit in the tool bag, right? I mean, you could fit the gold finches and the gold bars and the that. I mean, that's not your best friend. A larger universe of things could fit in the tool bag, but I think the fair inference that the jury can make and the jury did make is that the people who put the drugs into the plane and Boise himself necessarily expected that he was going to peel back that insulation blanket, see what is there, which is obviously, to any reasonable person, narcotics, put them into the, conceal them to get them out of the plane, and then hand them off to somebody else, which is why there was the empty tool bag and the many calls from the Lester burner phone as he was at the airport waiting to meet the citizen. So can I ask though, when you say it's obvious to any reasonable person, I mean, I'm looking at the picture. You tell me those drugs. I believe that. That seems plausible. But was there testimony that told the jury that that's what drugs look like to the exclusion of the other possibilities that it could have been? The agent who found the drugs said he was feeling around and felt something there behind the insulation, peeled it back, recognized this as a likely narcotics. It looked the way narcotics look. Photographed it in place, removed it. And then, of course, the jury actually, in addition to that photo, saw the drugs themselves and saw the packaging themselves. So I think the jury would have to know, unless it's a jury who has some knowledge from their own lifetime about how massive quantities of cocaine are packaged, and then you've got a problem if they're on your jury, they're going to need some evidence to tell them that this so obviously looks like drugs. Right. I don't think we asked the jury during jury selection what movies and TV shows they watched. Maybe we did actually ask them that, now that I think of it. But I think the appearance of those bricks of cocaine as they appear, both in the photograph and even more so in person in the courtroom when the jury could inspect them, was one that it is a common experience for people nowadays to recognize that this is narcotics. It's drugs. They won't necessarily know that it's cocaine or heroin or fentanyl or what it is. But it looks like drugs. That's what the law enforcement witness said. And I think that's what the jury could – it was within the province of the jury to make that determination themselves. And it shouldn't be second-guessed. Is it a matter that I wouldn't have a foggiest notion whether it was drugs or not? I guess not. I don't think so. I think probably the other – if Your Honor had been on the jury, maybe the other jurors would have had to clue you in a little bit. But in any event, I think that particular kind of question, what would be obvious to a person, that is a squarely – that is a jury question. And the jury decided. You're leaning more heavily on the look and feel of the items that were hidden behind the blanket and not so much on the trusted role that this individual played in – apparently played in that conspiracy. Both equally. I wouldn't say that I'm relying on one more than the other. It is obvious that the stuff in the plane was drugs of some kind. That's what the testimony was, and I think that's what the jury found. But additionally, the nature of the role is such that the other co-conspirators would have to trust this person, the inside man at JFK, to take that stuff out and move it somewhere else. Does it hurt your case at all that he never had a chance to do that? And so he saw what it was, but he didn't remove the thing he saw.  And there was some testimony about this and certainly argument about it. The sham cocaine that CBP put in, they did their best making it match the color and dimensions. But it's obviously sham, and there also wasn't enough of it. They only had four bricks rather than ten. And the one in particular that had the radio transponder device, the jury actually saw this demonstrated in the court room on a podium like this one. Its weight leaning against the side of the plane or on the podium depresses a button which keeps the radio transponder off. And when it's lifted, the button opens and it sends the signal that this was demonstrated in the courtroom. And there's a bunch of wires and stuff hanging out of the back. So the person who lifted it up, as the evidence showed the defendant did, was on the fact that there was testimony about the radio signal and also from the glow-in-the-dark residue on the grasping surfaces of his glove, which the jury also saw. The person who did that would very quickly recognize this is not the real thing. This is a trick, and would put it right back the way it was. The fact that he put it back the way it was rather than hopping out of the plane when he sees CBP saying, oh my God, you guys, you have to check this out. I think that also shows his consciousness of guilt. He didn't know there was a radio signal. He didn't know there was an invisible chemical on his fingers. So he put it back the way it was and hopped out of the plane. And when he sees CBP, he says, oh, hey, what's up, guys? That's what the testimony was for his first statements. And he covered up the lack of an international seal on his card, which would allow him to be on an international flight, which again goes to his consciousness of guilt. And I know I'm way out of time, but the last point that I just wanted to— This show has everyone this morning. Yeah, that's fair enough. The last point that I wanted to emphasize about Lester and the nature of the relationship, which I think is certainly part of the rule of Anderson, Your Honor noted, and I think it also is present in the earlier cases prior to Anderson, is he was in contact with this person using the burner phone, Lester. That phone was only active for a couple of weeks. There was contact throughout that time. But the key part of it started the night before the drugs came into the United States. There was a lot of testimony about this and argument about it. Yeah, but nothing about that— I mean, again, if the issue here is what singles out drugs as the object of the conspiracy, I don't understand how the communications with Lester helps you. That meeting helps me because it shows that the defendant, who lived out on Long Island and worked at JFK, went far out of his way for this midnight rendezvous in the South Bronx to have a face-to-face meeting with Lester. This was not a meeting that they conduct over the phone. It was not something they were communicating over text messages. Right. He was smuggled. So that shows that the nature of their relationship with Lester is such and the level of sophistication of the conspiracy is such. So you're saying that allows for the Anderson inference. That allows for the Anderson inference because he's having a face-to-face communication that we're not going to see explicit dirty communications. And then the one, the sort of closest text message that we see to a sort of explicit dirty communication is the confirmed message, which is very vague and seems to use coded language, which is right before the defendant goes to the airplane to buy cigarettes. So for all those reasons, we ask you. I have a question about this two-level enhancement. Why didn't he have the managerial responsibility? I'm sorry. Why did he? I mean, explain to me what you think your best argument is for the two-level enhancement. Yeah. So the enhancement can apply in the papers. We say two reasons. I think you could arguably call it three. There's abuse of private trust, abuse of public trust, and also use of a specialized skill. Although the defense counsel points out that the district court didn't use the magic words of a special skill, of course the court can affirm on any basis in the record, and there's sufficient language in the district court's ruling on that. So are you—maybe I'll ask the question differently. How is anybody that doesn't work at an airport not going to be susceptible to this enhancement under the government's theory? Anybody who doesn't work at an airport? In other words, wouldn't under the— or help me feel better about the fact that there's some reasonable limits to this. I see. And that this two-level enhancement would not happen or be imposed upon anybody who works in an airport and involved in smuggling. I understand. So there are two parts of this. One is the fact that just the nature of the tarmac and the defendant's access to the tarmac. Lots of people work at the airport who can't walk around on the tarmac and go up into the bellies of airplanes. The tarmac at JFK is one of the most secure locations in the district. Well, he can't either, right, because he doesn't have the right badge. Well, he's not allowed to. He's exceeding— Okay, but he did. But he did, and there was testimony about this fact that notwithstanding the places he can get discipline for going to, he was entrusted to have access to the whole of the tarmac. Because you never know when there's going to be an urgent mechanical issue on some plane, and all of a sudden now they need to— So basically any mechanic would be subject. Airline mechanics at JFK who go to places that are only accessible to airline mechanics at JFK or on the tarmac, I think, would be violating the public trust. I think it's the Roberts case where this court found that the— Okay. Is it limited to airports? What about Amtrak conductors or Amtrak engineers? I don't—I hesitate to speak too confidently on that. What about the folks who clean our chambers? I think it would depend on the nature of the crime. Probably just having access to the location is too common, I think, of an issue. Okay, so that's not the reason, and what's the other reason then? So it's not location and having access, which you started off with saying that that was the reason. Right. So not location and having access. What is another reason for why? I'm sorry. I thought you started off by saying he had access to the entire tarmac. That's right. But I think upon probing, like the same way that our custodial staff have access to our chambers, that you have at least now walked back from that, saying that that is perhaps too broad of an implication. So if it's not location, what is the other reason why? Okay, so I maybe—I apologize for interrupting. No, go ahead. I think I want to add a bit of nuance to my answer. It's not just that location isn't—is not enough, but it's like it's a location plus. There's some nexus here. It may be different if the custodial staff, you know, I don't think that they would apply the custodial staff like stole something out of the desk, but if the custodial staff used its access to in some way like harm the functioning of the court, you know, or going into secret materials or something like that, then maybe the analysis would be different. Here we have somebody who has access, essentially unfettered access, to the whole of the secure JFK tarmac and is going into the most— there's a lot of testimony about this at trial. One of the most sensitive parts of an airplane, the brains of the aircraft, as one of the witnesses called it, going in there to smuggle narcotics. That was an abuse of a public trust, the particular trust that the airline put in him. How much is the fact that he did that without permission change this? Like, I mean, a law break or law breaks, right? Right. So are you saying that that would be different than a flight attendant who could make up a reason to be there or a pilot of a plane who would be able to inspect it? I mean, to me, it would be different if they had gone through— if he had gone through a credentialing that allowed him, as a course of the credentialing, to be able to access the plane. He did something he wasn't allowed to do, and he tried to conceal it. So that may make him a lawbreaker, but why does that put him in a position of trust? So he did go through a credentialing. They don't actually trust him. Well, so the sort of strong version, or the sort of, like, most expansive version of the defendant's argument on this, I think would mean that this sentencing adjustment would never apply because, by definition, no one is authorized to commit crimes. So any time this person uses their position to commit a crime, they're always inherently exceeding their authority in some way. So it can be hard to disentangle the having the discretion from abusing the discretion, but I think it is important to keep those distincts because everybody is— I got it. I'm trying to figure out. He was specifically allowed to do some things. Right. He was specifically prohibited from doing others that he did anyway. So how is the fact that they didn't have, like, armed guards preventing him from doing the things he wasn't allowed to do put him in a position of abusing authority? Right. So there was testimony that he was licensed as a mechanic, that there are different kinds of licenses for mechanics, giving him special knowledge and also allowing him to qualify to have this kind of access. There was a vetting process that he went through to have the access that he had. He also—there was testimony that they are assigned every day to do certain tasks, but then there's lots of downtime, I think it's compared to being, like, a firefighter, where they're essentially just on call at the hangar in case an issue comes up with an airplane somewhere. So he is entrusted by the airline and by the public to be there at the airport in case there's an issue with an airplane and then to get out there quickly to quickly address it. And he, you know, went to a plane that didn't have any mechanical problems, so he wasn't directed to go to, using that access— Would a flight attendant qualify for this, do you think? A flight attendant wouldn't have access to the tarmac. A flight attendant could go into the airplane. And in the Roberts case, where this court affirmed the application of the enhancement, it was actually a sort of a crew chief of baggage handlers who was using his ability to sort of assign baggage handlers to facilitate a narcotics trafficking, and that's very much like this one. I think that is—in that case, this court found or ruled that that was an abuse of the airline's trust and then left open the decision of whether it was also an abuse of the public's trust because he was entitled to this sort of secure location at a highly secure facility at the airport. Is there a difference between the crew chief of the baggage handlers and an ordinary baggage handler who was in on the gig? I think there likely would be a distinction there because baggage handlers are just sort of a lower sort of rung on the—  —not just in terms of baggage handling and having a supervisor, but at the airport. Also, when you have baggage handlers— That also goes to the other issue of a baggage handler smuggling a briefcase who wouldn't necessarily know what it is. I mean, you could imagine a similar version of this case where the conspirator conceals the drugs in a piece of luggage and has a baggage handler grab the luggage with a red ribbon on the zipper or something, and the defendant wouldn't necessarily know, and that baggage handler wouldn't necessarily have any greater discretion than anyone else. Right. I guess I'm just coming back to the admonition that this adjustment doesn't apply to an ordinary bank teller who embezzles, but it does apply to the bank executive who embezzles. And it's feeling counterintuitive to me that the airplane mechanic is in the bucket with the executive rather than with the bank teller who is using their special key that they're entrusted with, that no one else has, to go in and raid the safety deposit box. Fair enough. I think there's a lot of room between the bank teller and the bank executive, and I think the airline mechanic is somewhere in between those extremes. Why? Why is the airline mechanic different from the bank teller? I know this is another version of what my colleague has already asked you, but... So I think the two reasons in the record are, one, that the airline mechanics in particular, different from other people who work at the airport, are understood to need access as part of their job to the most sensitive parts of the airport and of airplanes in a way different than... Not all the bank tellers have access to the safety deposit boxes, but this bank teller does. Does that make them subject to it? It would certainly be a very fact-specific inquiry. It may be that there is some sort of hierarchy of access to different parts of the bank. I don't know. I wouldn't want to rule that out. But I think the key thing here is this is the most sensitive parts of planes and airports, which are so sensitive because they are unique to mechanics, because it's mechanical stuff, it's the electronics of the airplanes. I just don't see the guidelines as dealing with levels of sensitivity. I see them as embodying almost a... Maybe authority? A level of authority, a level of... I mean, the examples they give are... None of them, you would think that they would... They talk about pilots. Pilots, lawyers, doctors, accountants, chemists, and demolition experts. That doesn't feel like the kind of list that encompasses airline mechanics, and I guess that's what I'm struggling with a little bit. I think the access that airline mechanics uniquely have to a thing like... Not just parts of the airplane that any passenger has access to or that any employee of the airport or the airline would have access to, but to the sensitive mechanicals on the underside of the plane when it's there parked at the terminal. That is a special thing that... Would it be different... It seems to me that if the case was sabotaging the plane, right, using their skills as a mechanic, that feels like it would start looking a lot more like this enhancement versus, at the end of the day, it's not the skills that get you there, it's the access. The sabotaging the plane isn't what the intent was here, but in fact, sort of factually, that's not too far from what some of the testimony about the sensitivity of this compartment was. The pilot himself actually did testify, and he, among others, testified that one of the reasons why the avionics compartment is so sensitive... But that's not the charge we're dealing with. I understand that. There's no charge involved. But even on the charge we're dealing with, the reason why the avionics compartment is so sensitive is because that's where all the electronics of the airplane go, and so if something... If the stuff was taped to the side of the airplane, of the fuselage, if it came unlodged during turbulence or something and started hitting wires, there was testimony that, at minimum, that would require an emergency landing. It would set off sensors in the aircraft, and it could be much worse than that. So, although that wouldn't be the intention of the conspiracy, the access that mechanics have to those parts of the plane sort of invoked the same equities. And then the last point that I want to raise on the same issue is that although that, again, Judge Arizari didn't sort of say the magic words of special skill, the government did argue, and her articulation of the reasoning for the application of the enhancement is sufficient to support that. He used his knowledge as a licensed mechanic who was educated to do this, not only to commit the crime, because this is a sort of mysterious compartment that most people, and even most baggage handlers, wouldn't probably know how to open, let alone what to do when they were inside. He used that not only to facilitate the crime, but also to make up a story to conceal the crime after the fact because it's a false exculpatory story, although ludicrously false when seen in the light of all the evidence, was a plausible one to the law enforcement officers who first interviewed him, because they're not mechanics. They don't know. And so he told them the story using his special knowledge, his special skill, that he was trained to have as a mechanic. That was a plausible one to them. Can you help me draw a line between a position of trust and having a job that makes it easier to commit the crime? Or would you say that they're one and the same? They're definitely not one and the same. I mean, they can't be one and the same. There are lots of jobs that give you access to the other side of the counter. Okay, so tell me how we draw the line. So, I mean, it's going to be a highly fact-specific inquiry every time.  And I think it... I think the language of... I think this is in the Roberts case about the baggage handler crew chief says it is a position that is characterized by substantial discretion and lack of supervision to commit difficult-to-detect wrongs. Okay, so it seems that he did not have a lot of discretion, but he had a lack of supervision. Is that right? I disagree with the first part. Really? I think, yes, absolutely. They told him he couldn't go where... He wasn't qualified to deal with custom planes. They put a lot of limits on him. I mean, he violated those limits, but you're also not asking us to say that just because he committed a crime... So there was some testimony that the custom seal that goes on the card allowing access to international flights is a federal government decision. That is not the airline's decision. That's something that either CBP or maybe some other agency of the government decides. The airline, although they couldn't give that to him without the government, they entrusted him to have total access to the tarmac, to all the planes, to all the secure areas of the airport. He exceeded that authorization when he went into an airplane that he wasn't, you know, authorized to go into. But he did have, essentially, free reign over the airport whenever he wasn't actively working on another case, which the job required the airline to entrust him to do that because of the sort of nature of the work. You would sometimes have urgent jobs where there's a mechanical issue on a plane waiting to take off, and you have to get out there quickly. So he did have, in fact, free range over the airport. There was a lot of testimony because of his, what we argue, of surveillance of the plane throughout the day where he was swiping in to different parts of the terminal, you know, and there was testimony that, you know, mechanics do that. Sometimes there's one where he's on video getting coffee. He drives right underneath the nose of the airplane. He gets coffee. There's another where he may have used the bathroom or something, it's unclear, but he was in the clear side of the airplane. There was testimony that mechanics are allowed to do that stuff. They can go around the terminal if they're on downtime and get their favorite, you know, coffee at the Dunkin' instead of the Starbucks at the airport, things like this, go to different parts of the tarmac. But in this case, he was abusing that authority to go into a particular aircraft without any legitimate reason. And then on the lack of supervision to commit difficult-to-detect crimes, I mean, no one was watching over his shoulder. And there was testimony from the CBP agents who were actually watching him when he went into the airplane, saying, we see somebody driving an American Airlines vehicle wearing an American Airlines mechanic gear going up into an airplane. We don't think twice about it. That's what they're supposed to do. And it was only when he set off the radio transponder that they go in to see what's going on. So he was, in fact, entrusted and given very little supervision, you know, which he used to facilitate the commissioning of these crimes that are difficult to detect. Okay. I think we've heard your argument. Thank you very much. I appreciate it. Mr. Pollack, you get the closing words here? Not Mr. Pollack. Oh, sorry. Mr. Anderson. Thank you, Your Honor. The government spent a lot of efforts proving and then arguing to the jury that Bloise had no permission to do what he did and the conduct that he engaged in, which is the conduct that was necessary for him to try and attempt this crime. The district court, in explaining why it believed the sentencing enhancement does apply, said he violated all of the rules governing the conduct that he was supposed to engage in and what he was permitted to do. That is as good an explanation as you can get if you look to the relevant commentary application, footnote one, for why the enhancement does not apply. Going back to our primary point on appeal, there is plenty of evidence of consciousness of guilt. But guilt of what? The holes in the jacket? The Lester? I want to finish what I was trying to say before earlier. If you change one aspect of this, and that's what the CBP officers found, if they opened those exact same packages and instead there was bundled currency, that one change in this entire record, there would still be equal basis for a jury to conclude either that Beloisi erroneously thought he was involved in a controlled substance offense, and if he had seen those packages, would have been surprised to feel, oh, they're actually currency, or it would have given them equal basis to conclude, actually, you can charge him under a different crime. He knew, based on this record, that this was going to be smuggled foreign currency. That's the only thing you need to change in this record in order for the statute under which he's charged to change and for a conviction to be valid in this case. Are there any further questions from the court? Appreciate it. Thank you very much. Thank you all for hanging in there. Appreciate your arguments. We'll take it under advisement.